IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANASTACIO B. PALAFOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.   14-cv-543-SCW |
| | ) | |
| JOYCE LUCAS, and | ) | |
| RYAN HAMMONDS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

Plaintiff Anastacio Palafox brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights stemming from treatment he received while he was on a hunger strike.   This matter is before the Court on two Motions for Summary Judgment filed by Defendants Lucas (Doc. 82) and Hammonds (Doc. 84).   Plaintiff has filed responses to these motions, and the motions are ripe for disposition.   Because no jury could reasonably find that Defendants Lucas and Hammonds acted with deliberate indifference, the Defendants' motions are **GRANTED**.

### FACTUAL AND PROCEDURAL BACKGROUND

The events at issue in this lawsuit took place at Pinckneyville Correctional Center ("Pinckneyville").   (Doc. 83-1, p. 10).   On December 26, 2012, during his evening meal at around 4:30 p.m., Plaintiff declared himself on a hunger strike in protest of a sexual

misconduct ticket he had received.   (*Id.* at 4; Doc. 83-2; Doc. 83-3, p. 1).   Plaintiff ended his hunger strike at his evening meal two days later on December 28, 2012.   (Doc. 83-1, p. 10; Doc. 83-3, p. 2; Doc. 83-4, p. 1).   Plaintiff acknowledged that, during his hunger strike, he was seen by one nurse every shift, which was three times a day.   (Doc. 83-1, p. 4).   After 72 hours on hunger strike, it is standard for inmates to be taken to the Health Care Unit for further monitoring and treatment as necessary.   (Doc. 83-1, p. 8).

Plaintiff was seen by Nurse Stewart the evening of December 26 after having declared his hunger strike.   (Doc. 83-3, p. 1).   Medical records indicate that Nurse Stewart took Plaintiff's vitals during this visit, which indicated his blood pressure was 130/72, his pulse 68, respirations 22, and temperature 98 degrees Fahrenheit.   (*Id.*)   Plaintiff does not disagree that these vitals were taken.   (Doc. 83-1, p. 26).   Nurse Stewart's treatment plan was to encourage Plaintiff to drink fluids.   (Doc. 83-3, p. 1).   At 3:00 a.m. on December 27, 2012, Plaintiff was seen by Nurse Elder.   (*Id.* at 3; Doc. 83-8, p. 1).   Plaintiff informed her he was not going to eat, and Nurse Elder's treatment plan was to encourage Plaintiff to eat and drink.   (Doc. 83-1, p. 3; Doc. 83-8, p. 1).   Plaintiff was then seen by Defendant Lucas at 12:40 p.m. on December 27, 2012.   (Doc. 83-3, p. 3; Doc. 83-6, p. 13).   Defendant Lucas assessed that Plaintiff was on a hunger strike.   (Doc. 83-6, p. 13).   Plaintiff walked to the door of the cell he was in and told Defendant Lucas he was given a false ticket.   (*Id.*).   Lucas' treatment plan was to encourage Plaintiff to eat and drink.   (*Id.*).   Traci Peek, a registered nurse, sat for a deposition as part of this lawsuit.   Nurse Peek provided her medical opinion that,

considering Plaintiff's medical history, including the medications he was taking, having started his hunger strike at 4:30 p.m. on December 26, 2012, he would not have reached a state of medical emergency from the hunger strike by the time he was seen by Defendant Lucas at 12:40 p.m. on December 27.   (Doc. 83-5, p. 2, 8).   Plaintiff disputes, however, the admissibility of Nurse Peek's testimony.   (Doc. 86, p. 4).

According to medical records, and Nurse Peek's testimony based on the records, Plaintiff was seen by Nurse Harmon at 4:42 p.m. on December 27.   (Doc. 83-3, p. 3; Doc. 83-5, p. 7).   Nurse Harmon took Plaintiff's vitals which indicated that his blood pressure was 124/68, pulse 68, respirations 18, temperature 97.2 degrees Fahrenheit.   (Doc. 83-3, p. 3; Doc. 83-8, p. 2).   At his deposition, Plaintiff testified that he had no reason to dispute that the medical records indicate his vitals were taken at this time.   (Doc. 831, p. 7).   According to the records, Nurse Harmon's treatment plan was to encourage Plaintiff to eat and drink.   (Doc. 83-3, p. 3).   Plaintiff was then seen again by Nurse Elder at 3 a.m. on December 28, 2012.   (Doc. 83-3, p. 4).   Nurse Elder noted that Plaintiff refused to eat and her treatment plan was to continue to encourage Plaintiff to eat and drink.   (*Id.*).

On December 28, at 11:30 a.m., Plaintiff reported to Defendant Hammonds, a correctional officer, that Plaintiff had cut his head on his bed.   (Doc. 83-7).   Hammonds contacted the Health Care Unit ("HCU") to come treat Plaintiff in his cell.   (*Id.*).   Nurse Peek responded to Defendant Hammonds' request at 11:45 a.m. and went to Plaintiff's cell to assess and treat him.   (Doc. 83-5, p. 3).   When Nurse Peek arrived, Plaintiff

reported to her that he fell when walking to his cell door.  (*Id.*).  Plaintiff's cut was cleaned and treated by Nurse Peek.  (*Id.*).  Though it is disputed by Defendants and Nurse Peek, Plaintiff claims that after she treated his cut, Nurse Peek told Defendant Hammonds that Plaintiff should go to the HCU, but that Defendant Hammonds refused. (Doc. 87-1, p. 8).  Plaintiff claims that he was on the floor an hour after his fall before he spoke to Hammonds.   (Doc. 83-1, p. 10).

Plaintiff testified that, just prior to his fall, on a scale from 1 to 10 in terms of severity, he was experiencing dizziness at a "10" and weakness at a "9 or 10."  (Doc. 83-1, p. 8).  Additionally, Plaintiff was also taking two medications, Trazodone and Celexa, at the time of his fall, which he asserts cause side effects such as dizziness and fainting.  (Doc. 86-4, p. 1; Doc. 86, p. 5).  Defendant Lucas admits to having administered medication to Plaintiff.  (Doc. 86-3, p. 2; Doc. 86-4, p. 1 – 2).  While Nurse Peek opined that side effects of medication usage would not appear four years into the use of the medication and one year in to the same medication dosage when the medication had been received on a consistent basis, as with Plaintiff, this opinion, and its admissibility are disputed by Plaintiff.  (Doc. 83-8, p. 3; Doc. 86, p. 8).

At some point, Defendant Lucas saw Plaintiff again.   At his deposition, Plaintiff first testified that Defendant Lucas came by Plaintiff's cell roughly 20 to 30 minutes before he fell.  (Doc. 83-1, p. 10).  Plaintiff later testified that he did not remember the day in question and did not recall whether Defendant Lucas came by again before or after his fall.   (*Id.*).  Plaintiff testified that when Defendant Lucas came by, she seemed

tired of him, and that he told her that he was not feeling well.   (*Id.*).   Defendant Lucas responded by telling that he would not feel that way if he would eat.   (*Id.*).

Plaintiff contends that each time he spoke with a nurse during his hunger strike, he indicated he was feeling weak, dizzy, and had a headache.   (Doc. 83-1, p. 6).   His dizziness, weakness, and headache worsened the longer he went without food.   (*Id.*). He also claims, in his handwritten complaint, that both Defendants Lucas and Hammonds told him that they "don't treat prisoners who go on hunger strikes;" "you made us have to do a ton of paper work; "you can die for all we care."   (Doc. 86-6, p. 6). While Plaintiff does not recall how many times security staff came to his cell to check on him during his hunger strike, he does recall security staff checking on him shortly before his fall.   (Doc. 83-1, p. 18, 19).   Nurse Peek testified that Plaintiff's vitals were within normal limits when they were taken on the evening of December 26 and at 4:42 p.m. on December 27.   (Doc. 83-5, p. 7).   Plaintiff claims that he currently suffers from headaches as a result of the fall.   (Doc. 86-2, p. 5).

LEGAL STANDARD

### 1. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions.   The rule states that summary judgment is appropriate only if the admissible evidence considered as a whole shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.   ***Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED.R.CIV.P. 56(a))**.   The party seeking

summary judgment bears the initial burden of demonstrating – based on the pleadings, affidavits and/or information obtained via discovery – the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986)**. A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986)**. *Accord Bunn v. Khoury Enterpr. Inc.*, **753 F.3d 676 (7th Cir. 2014)**.

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson v. Donahoe*, **699 F.3d 989, 994 (7th Cir. 2012)**; *Righi v. SMC Corp.* , **632 F.3d 404, 408 (7th Cir. 2011)**; *Delapaz v. Richardson*, **634 F.3d 895, 899 (7th Cir. 2011)**. As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, **756 F.3d 542 (7th Cir. 2014)**.

## 2. Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005) (quoting** *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (internal quotation marks omitted)).** *Accord Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate**

**indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**.   A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care.   *Holloway v. Delaware Cnty. Sheriff*, **700 F.3d 1063, 1074 (7th Cir. 2012) (stating that a prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards"); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).**   Although a prison official may not continue a course of treatment he knows is blatantly ineffective, prisoners are not entitled to receive unqualified access to healthcare.   *See Holloway*, **700 F.3d at 1073-74**.   A doctor may provide the care he feels is reasonable so long as it falls within a "range of acceptable courses based on prevailing standards in the field."   *Id.* **at 1073**.

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test.   *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).**   The first prong is whether the prisoner has shown he has an objectively serious medical need.   *Arnett*, **658 F.3d at 750.   *Accord Greeno*, 414 F.3d at 653.**   A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.   *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).   *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth***

*Amendment* requires "deliberate indifference to a *substantial* risk of *serious* harm.") (internal quotation marks omitted) (emphasis added).   Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable.   *Greeno*, **414 F.3d at 652-53**.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health.   *Greeno*, **414 F.3d at 653.**   The plaintiff need not show the defendant literally ignored his complaint, just that the defendant was aware of the serious medical condition and either knowingly or recklessly disregarded it.   *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).**   Deliberate indifference is not negligence; rather it is more akin to intentional wrongdoing.   *McGee v. Adams*, **721 F.3d 474, 480 (7th Cir. 2013).**   The standard is criminal recklessness, and even gross negligence will not meet this standard.   *Id.* **at 481**.

ANALYSIS

## 1. Defendant Lucas

The facts presented to the Court fail to demonstrate that Plaintiff can recover against Defendant for his Eighth Amendment claim relating to her monitoring of him during his hunger strike.   In order to recover on a claim of deliberate indifference to serious medical needs, the Plaintiff must demonstrate an actual serious medical need, and the conditions he describes prior to his fall, such as dizziness, weakness, and

headache, fail to demonstrate such a need at the times he was monitored by prison staff, including by Defendant Lucas.   Plaintiff has not pointed the Court to any expert testimony contradicting Nurse Peek's testimony that Plaintiff's vitals were within normal limits prior to his fall, including at the time Defendant Lucas treated him on December 27.   The Court notes that Plaintiff disputes the admissibility of Nurse Peek's testimony as to what Plaintiff's vitals were, as well as, her opinions relating to the vitals, however.

Plaintiff argues that because Nurse Peak did not personally examine Plaintiff, her testimony as to his vitals is based on hearsay and that she is also not qualified to give an opinion as to the nature of his condition.   The Court disagrees, however.   Nurse Peak's testimony is based on Plaintiff's medical records, for which Defendant Lucas has provided an affidavit from the Records Custodian at Menard.   (*See* Doc. 90-2).   Plaintiff has not shown that the records or their method of preparation indicate that they are untrustworthy, and the Court finds that the records meet the business records exception to the hearsay rule as set forth in Federal Rule of Evidence 803(6).[1]   Therefore, Nurse

---

[1] Rule 803(6) exempts from the hearsay exception:

    A record of an act, event, condition, opinion, or diagnosis if:
     (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
     (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
     (C) making the record was a regular practice of that activity;
     (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
     (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Peak's testimony as to Plaintiff's vitals is admissible.[2]

Nurse Peek's opinion testimony is also admissible.   While the Federal Rules of Evidence bar opinion testimony by a lay witness, **FED.R.EVID. 701**, such testimony by an appropriate expert is admissible, **FED.R.EVID. 702**.   Nurse Peek's specialized knowledge and qualifications as a Registered Nurse certainly qualify her to provide opinion testimony as to Plaintiff's general condition based on a review of his vitals in the medical records.   Plaintiff also makes an undeveloped argument suggesting that Nurse Peek's testimony should not be considered since she was not disclosed as an expert.   Nurse Peek sat for a deposition, however, and Plaintiff's counsel was present.   (*See* Doc. 83-5, p. 1).   At that deposition, Nurse Peek was asked questions as to her medical opinions relating to Plaintiff's condition, and counsel for Plaintiff had the opportunity to cross examine her.   Moreover, her deposition testimony also put Plaintiff on notice that she had given expert opinion testimony and could be used by the Defendants as an expert.

Assuming that Plaintiff suffered from severe weakness and dizziness shortly prior to his fall, there is no evidence to sufficiently demonstrate that Defendant Lucas had actual knowledge of the severe weakness and dizziness.   Plaintiff's general testimony that he told each nurse who checked on him that he was weak, dizzy, and had a headache, is not sufficient to demonstrate knowledge of an objectively serious medical condition, particularly given that Plaintiff's vitals were normal when he was checked-on by the nurses.   While Plaintiff may have suffered from dizziness and weakness

---

[2] Alternatively, the testimony and records regarding Plaintiff's vitals, and the fact that Nurse Peek relied on his medical records, can be considered by the Court pursuant to Federal Rule of Evidence 703.

registering at a "10" shortly before he fell, Plaintiff has failed to point the Court to anywhere in the record demonstrating that Defendant Lucas had actual knowledge of this specific severe dizziness and weakness.   It is not enough to argue that Defendant Lucas should have known of the severe dizziness and weakness, as the standard for deliberate indifference requires actual knowledge of the objectively serious condition. Nor is there any evidence that Defendant Lucas buried her head in the sand and turned a blind eye toward Plaintiff's condition.   Rather, she checked on Plaintiff at least once, and possibly two times before his fall.   Assuming she checked on Plaintiff shortly before his fall, there is no evidence that Defendant Lucas knew of his severe dizziness. There is simply no evidence in the facts highlighted by the parties to demonstrate that Defendant Lucas had actual knowledge of an objectively serious medical condition on the part of Plaintiff.

Further, Plaintiff's assertions relating to the supposed side effects of his medication fail to hold water.   Plaintiff argues that a jury could infer that his dizziness was triggered or made worse by taking his medications without drinking or eating anything.   Even assuming this fact is true, Plaintiff fails to argue why such a fact would mean that a jury could find Defendant Lucas deliberately indifferent.   In fact, assuming that dizziness is a side effect of any of Plaintiff's medications, there is no evidence in the record to demonstrate that Defendant Lucas was aware of such a side effect. Regardless, Nurse Peek's opinions aside, Plaintiff has not pointed the Court to any evidence indicating that the dizziness leading to his fall was in fact in any way related to

the medication he was taking.   Plaintiff has not pointed the Court to any expert testimony establishing such a link.   Contrary to Plaintiff's assertions, to ask a jury to infer that Plaintiff's fall was linked to side effects from his medications would invite the jury to speculate.

Though the case is not squarely on point, the Court finds principles raised in the Seventh Circuit's opinion in *Rodriguez v. Briley*, **403 F.3d 952 (7th Cir. 2005)**, to be persuasive and instructive.   In that case, inmate Rodriguez was forbidden from leaving his cell, and thereby prevented from having meals, because he would not comply with a prison rule requiring storage of certain items in a storage box in his cell.   **403 F.3d at 952**. During the 18 month period that Rodriguez refused to comply with the rule, he missed between 300 and 350 meals, suffered from rash and fatigue, and lost 90 pounds.   *Id.* Rodriguez filed suit against prison officials alleging that their failure to provide him food violated the Eighth Amendment.   The Seventh Circuit disagreed, however, and upheld the district court's grant of summary judgment for the defendants.   The circuit court held that Rodriguez was not punished by the defendants; rather he punished himself by failing to comply with the rule.   *Id.* **at 953**.   The court noted that all Rodriguez had to do was comply with the rule, and then he could leave his cell and go to the cafeteria.   *Id.*   Rodriguez, rather than the prison, was "the author of his being denied dinner."   *Id.*   The court stated that Rodriguez could not "be permitted to engineer an Eighth Amendment violation."   *Id.*   The Seventh Circuit noted, however, that at a certain point, where refusal to eat would turn suicidal, or where the inmate's

actions were the product of insanity, the prison would have to intervene.   *Id.*

Though Plaintiff's suit is in regards to the alleged deliberate indifference of Defendants, where Rodriguez's appears to be premised upon the conditions of his confinement, similar principles apply.   Like Rodriguez, Plaintiff Palafox was the author of his lack of food, and at any point could end his situation by deciding to eat.   Plaintiff held the keys to his own situation, and he cannot engineer his own Eighth Amendment violation.   Moreover, there is not evidence sufficient to demonstrate that Defendant Lucas exhibited any deliberate indifference toward Plaintiff.   Rather, Plaintiff was checked-on by nurses three times a day, and at least once, if not twice, by Defendant Lucas, prior to his fall less than two days into his hunger strike.   There is no indication that Plaintiff was in a dire medical emergency when he was seen by Defendant Lucas, and each time she saw Plaintiff, Defendant Lucas instructed him to eat and drink. Though Defendants Lucas and Hammond may have told Plaintiff that they don't treat prisoners on hunger strikes and that he could die, the facts demonstrate that their actions did not match their words, and Plaintiff was in fact treated.   Though he may not have been provided the exact treatment he wanted, Plaintiff is not entitled to demand specific care.   *See Holloway*, **700 F.3d at 1074;** *Forbes*, **112 F.3d at 267**.   Pinckneyville staff, including Defendant Lucas, took reasonable measures to monitor and treat Plaintiff relating to his self-imposed hunger strike, and no reasonable jury could find that Defendant Lucas was deliberately indifferent.   *See Garfield v. Furlong*, **2017 WL 1152839, *5 (S.D. Il. March 28, 2017) (summary judgment was appropriate where no**

Page **13** of **16**

**jury could find that defendant medical director did anything other than take reasonable measures to treat inmate following oral surgery)**.

### 2. Defendant Hammonds

Nor could a jury find Defendant Hammonds liable for deliberate indifference. Plaintiff has not pointed the Court to any fact in the record demonstrating that Defendant Hammonds had knowledge of Plaintiff's severe dizziness prior to his fall. Though Plaintiff claims that he was on the floor of his cell for an hour after he passed out and hit his head, there is no evidence that Defendant Hammonds was aware that Plaintiff was lying on the floor of his cell during that time.   Nor is there is any evidence that Defendant Hammonds willfully refused to check on Plaintiff while he was lying on the floor of his cell.

Plaintiff also cannot recover against Defendant Hammonds for the defendant's refusal to allow Plaintiff to go the HCU after his fall.  After Plaintiff fell, Defendant Hammonds contacted the HCU, and Plaintiff received treatment for the cut on his head from Nurse Peek in his cell.  Other than his testimony that Nurse Peek stated that Plaintiff should be taken to the HCU, which nurse Peek disputes, there is no evidence indicating that Plaintiff needed further treatment.   Just as an athletic trainer would tend to an athlete's cut on the field, as opposed to at a hospital, Nurse Peek tended to Plaintiff's cut in his cell as opposed to in the HCU.   It was still within 72 hours after he began the hunger strike, and it is not clear what taking Plaintiff to the HCU at that time would have done for him.  It seems to the Court that the best additional treatment

Plaintiff could have received would have been to start eating and drinking, which Plaintiff could have decided to do at any point.   Even assuming that Defendant Hammonds refused to take Plaintiff to the HCU over Nurse Peek's direction, there is no evidence to allow a juror to reasonably infer that Plaintiff was harmed by Hammonds' refusal.   Plaintiff ended his hunger strike a few hours later, and Plaintiff has not demonstrated to the Court that he suffered any harm before eating again that was caused by Defendant Hammonds' actions.   Though Plaintiff complains that he currently suffers from headaches, there is no evidence to allow a jury to determine whether the headaches are caused by Plaintiff's fall, Defendant Hammonds' refusal to send Plaintiff to the HCU after his fall, or something else unrelated.   In short, Plaintiff cannot recover from Defendant Hammonds for deliberate indifference.

CONCLUSION

After Plaintiff went on his self-imposed hunger strike, the medical and security staff at Pinckneyville monitored him, encouraged him to eat, and administered treatment when he hit his head.    No jury could reasonably find that Defendants Lucas and Hammonds violated Plaintiff's Eighth Amendment rights. Therefore, the Defendants' Motions for Summary Judgment (Docs. 82, 84) are **GRANTED**.   Plaintiff's claims against Defendants are **DISMISSED with prejudice.**   The Clerk of Court is **DIRECTED** to enter judgment against Plaintiff Palafox and close the case.

**IT IS SO ORDERED**.
DATED: 3/31/2017

*/s/ Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge
